**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TONY JUAREZ,                                        No. C-09-4290 EMC (PR)

        Petitioner,

    v.                                          **ORDER DENYING PETITION FOR**
                                                    **WRIT OF HABEAS CORPUS**
KATHY ALLISON, Warden,

        Respondent.
_____/

## I.   INTRODUCTION

Petitioner seeks federal habeas relief from his state convictions.  For the reasons stated herein, the petition for such relief is **DENIED**.

## II.   BACKGROUND

In 2006, a Monterey County Superior Court jury convicted Petitioner of second degree murder, consequent to which he was sentenced to 15 years-to-life in state prison.  The state appellate court, which issued the last reasoned decision, affirmed his conviction on direct review.  The state supreme court summarily denied his petition for direct review.  The state superior, appellate, and supreme courts denied his petitions for collateral review.  This federal habeas petition followed.

Evidence presented at trial demonstrated that in 1988 Petitioner threw his two year-old son Anthony against a crib, causing injuries resulting in his death.  The state appellate court, in its direct review of Petitioner's convictions, summarized the background facts as follows:

> In 1988, [Petitioner]'s wife, Stephanie Rodriguez, returned home from work and discovered the couple's two-year-old son, Anthony, limp, in distress and [Petitioner] asleep, smelling of alcohol.  She gathered

**United States District Court**
For the Northern District of California

Anthony, awoke [Petitioner], and told [Petitioner] to drive to the hospital. On the way, Rodriguez asked what had happened and [Petitioner] replied that Anthony had fallen but was fine before going to sleep. Anthony died during surgery from a fractured skull. Monterey County Sheriff Investigators, Detectives Norman Snyder and Dave Ealy, and Monterey County Coroner Investigators, Deputy Sheriffs John DiCarlo and David English, responded to the hospital. The next day, Detective Snyder interviewed [Petitioner] at [Petitioner]'s home. [Petitioner] told Detective Snyder that Anthony was standing on a patio railing and fell, hitting his head on concrete. Detective Snyder determined that the incident had occurred in Salinas, which was outside county jurisdiction. He then informed Salinas Police Detectives Lukenbill and Lambert, who indicated that the Salinas Police Department would undertake the investigation. At some point, Deputy DiCarlo received a Salinas Police Department report No. 88-102243 for the case. Ultimately, Salinas Police Detective Joe Gunter communicated to Deputy DiCarlo that Anthony's death was accidental. Deputy DiCarlo wrote a coroner's report that referenced the police department report number. FN1[.]

FN1. The report itself was not evidential. As to cause of death, coroner's pathologist Dr. Hugh Wilson performed the autopsy and testified. In addition to "trauma at the back of the head," Dr. Wilson saw oval-shaped bruises to the eyes that were consistent with grip marks and an elbow bruise, all having occurred within 24 hours of death. He also saw an older bruise on Anthony's right arm and a healing rib fracture.

In 1989, [Petitioner] and Rodriguez became born again Christians and joined the Lighthouse Church. About three years later, [Petitioner] told Pastor Alfred Florez that he had killed Anthony. He thereafter told the same to Rodriguez and detailed that he had slammed Anthony against the wall.

In 1995, [Petitioner] and Rodriguez separated. [Petitioner] then moved to Arkansas.

In 2002, Rodriguez told the Salinas Police Department what she knew about Anthony's death. Police recorded telephone calls and an Arkansas motel-room conversation between [Petitioner] and Rodriguez.

(Ans., Ex. C at 1–2.)

As grounds for federal habeas relief, Petitioner claims that (1) the prosecutor and the police department violated his right to due process by failing to preserve a police investigative report; (2) the prosecutor failed to disclose the police report to the defense; (3) the trial court failed to properly instruct the jury; and (4) defense and (5) appellate counsel rendered ineffective assistance.

### III.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *Id*. at 409.

### IV.   DISCUSSION

Most claims relate to a police report allegedly written in 1988 by Salinas Valley police regarding the investigation into Anthony's death.  The state appellate court summarized the facts as follows:

> Before trial, [Petitioner] filed a motion "for an evidentiary hearing as to whether a '*Brady*' violation has occurred."  The motion informed that [Petitioner] had sought Salinas Police Department report No.

88-102243 but had been told that no such report existed.  It wished "to determine whether such report ever existed and whether it still exists, and if once existed, and now non existent, the appropriate sanctions to be applied to the prosecution herein."

At the hearing, the following occurred:  Detective Gunter did not recall investigating Anthony's death or discussing the matter with Deputy DiCarlo; he opined that, had he made an investigation, a report would have been generated.  Deputy DiCarlo recalled conversing with Detective Gunter about Anthony's death, being given the report No. 88-102243 by someone, and learning from Detective Gunter that the investigation into Anthony's death "did not indicate [that] any crime [was] involved"; he related that there was no police report in the coroner's file though he usually requested a copy.  Salinas Police Department records manager Rachel Soratos affirmed that No. 88-102243 was consistent with the department's numbering system, no report corresponded to that number, no report corresponded to other case-identifying information, and an accidental-death report could have been routinely purged but the department is required to retain all child abuse reports.

From this, [Petitioner] concluded that "certain sanctions are appropriate" short of dismissal and asked for leave to prepare a jury instruction.  When the trial court asked [Petitioner] to explain the legal basis for sanctions, [Petitioner] replied "due process of law wherein there was actions taken by an agency and nothing was preserved." The prosecutor assisted by offering that [Petitioner]'s point appeared to be "a *Hitch/Trombetta/Youngblood* motion, which involves destruction of evidence and that involves due process — the origin of the rule is due process — then there has to be some kind of malicious destruction."  He then explained that no such malicious destruction was shown because no police officer testified to having conducted an investigation and no witness testified to having been interrogated by the police about the case.  He concluded that there was no evidence that "anyone ever wrote a report."  [Petitioner] then offered: "I characterize this mainly as a *Brady* motion mainly because a police agency has a duty to write reports."  He urged that Deputy DiCarlo's testimony showed that Detective Gunter made an investigation and determination.  The trial court found that there was no evidence "that someone went in and found the report and then with some evil motive, destroyed it."  It then mused whether the authorities "that must be applied to the setting require, allow the Court to provide any kind of an instruction specific to that."  [Petitioner] offered that the point was "going to require some thought," and the trial court agreed to address the matter further during the trial.

At trial, Detective Gunter's hearing testimony was read to the jury and Deputy DiCarlo testified consistently with his hearing testimony. Soratos testified and opined that police report No. 88-102243 never existed because it was not in the police computer system.  She explained that, since her hearing testimony, she had performed research and determined that all police reports would be in the computer system, though hard copies might be purged.  She added that it was common for a police report number to be generated without resulting in a written report.  She gave an example where a police

**United States District Court**

For the Northern District of California

officer in the field "pulls a report number" while investigating a case but later "It turns out the case is nothing." Salinas Police Detective Sheldon Bryan testified that a case number is oftentimes not used again after a police officer pulls a case number but does not write a report. He added that he had searched the police records after Rodriguez had first contacted him and discovered that police report No. 88-102243 "actually came back to something completely unrelated to [Petitioner]'s family." He continued that, after this discovery, he had searched 100 case numbers before and after No. 88-102243, encompassing dates well before and after Anthony's death, and found no police report relating to Anthony's death.

[Petitioner] argued that "a public record was apparently destroyed." He also assumed the police had an official duty to prepare a police report and relied on Evidence Code section 664 ("It is presumed that official duty has been regularly performed"). He requested that the trial court give the jury the following special instruction: "You may consider the fact that no report was maintained of the initial investigation as evidence that the initial investigation in this matter determined the death of the child victim as accidental." The prosecutor replied that there was never a report, ergo there was no bad faith destruction to trigger any remedy.

The trial court assumed that the police had an official duty to prepare a report. It then focused on Sorato's testimony that there was no report and concluded that "the evidence that was presented refutes [the Evidence Code presumption] at least to some degree." It refused to give [Petitioner]'s proposed instruction but observed that [Petitioner] was free to argue that the police generated a report, which concluded that Anthony's death was accidental.

(Ans., Ex. C at 3–5.) The state appellate court rejected Petitioner's claims:

[Petitioner] contends that the loss of the police report violated his state and federal rights to due process. He urges that the report should have been "provided under the due process requirement that all exculpatory evidence be provided to the defense." He relies on *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), and *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 (*Youngblood*). There is no merit to this claim.

First, [Petitioner] confuses his mix of authorities.

*Brady* held that a prosecutor's failure to disclose favorable evidence to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra*, 373 U.S. at p. 87.) To establish that the government's failure to turn over evidence violates *Brady*, the [Petitioner] must demonstrate (1) the undisclosed evidence was favorable, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the evidence was material to the defense. (*See Strickler v. Greene* (1999) 527 U.S. 263, 280–281; *In re Brown* (1998) 17 Cal.4th 873, 879.)

5

Here, [Petitioner] does not demonstrate the second element of a *Brady* claim. No evidence supports that the prosecution or anyone on the prosecution team had possession of the police report at issue and thereafter suppressed it.  Even if one accepts that a police report for this case existed at one time, it is undisputed that (1) the report did not exist in 2002 when Detective Bryan began his investigation of this 1988 offense, and (2) there is no explanation for the report's nonexistence.  From this, one can reasonably infer that (1) the report was lost, or (2) Detective Gunter pulled the number but did not write a report.  But one cannot reasonably infer that a report was suppressed.  [Petitioner] is simply speculating that the prosecution willfully or inadvertently suppressed the report.  Such speculation cannot establish a *Brady* violation. (Cf. *United States v. Spagnuolo* (9th Cir.1977) 549 F.2d 705, 713 [no undisclosed evidence existed]; *U.S. v. Mitchell* (7th Cir.1999) 178 F.3d *904 [speculation not enough to show Brady violation]; United* States v. Navarro (7th Cir.1984) 737 F.2d 625, 631 [same]; *U.S. v. Pou* (8th Cir.1992) 953 F.2d 363, 366-367 [same].)

Here, as below, [Petitioner] attempts to show *Brady* error when the facts reveal that the sought after evidence had been, at best (from [Petitioner]'s perspective), lost.  Consequently the analysis falls squarely under *Trombetta* and *Youngblood*.

The failure to preserve, or the destruction of evidence by the prosecution, was specifically addressed in *Trombetta* and *Youngblood*.  In *Trombetta*, the court held that the government has a duty under the United States Constitution to preserve evidence "that might be expected to play a significant role in the [[Petitioner]'s] defense."  To meet this standard, the evidence must "both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the [Petitioner] would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta*, *supra*, 467 U.S. at 488–489.)  In *Youngblood*, the court added that, to show a denial of federal constitutional due process from the destruction of such evidence, the [Petitioner] must also show that the police acted in bad faith.  (*Youngblood*, *supra*, 488 U.S. at p. 58.)  Our Supreme Court has expressly adopted the holdings of *Trombetta* and *Youngblood*.  (*People v. Frye* (1998) 18 Cal.4th 894, 942–943; *People v. Zapien* (1993) 4 Cal.4th 929, 964; *People v. Cooper* (1991) 53 Cal.3d 771, 810–811.)

"[A] trial court's inquiry whether evidence was destroyed in good faith or bad faith is essentially factual:  therefore, the proper standard of review is substantial evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 831.)  Under this standard, "we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling."  (*People v. Roybal* (1998) 19 Cal.4th 481, 510.)  The testimony of a single witness, even if he is a party to the case, may be sufficient.  (Evid. Code, § 411.)  We do not decide the credibility of witnesses, as that is the function of the trier of fact.  (*People v. French* (1978) 77 Cal.App.3d 511, 523.)

[Petitioner]'s *Trombetta/Youngblood* claim fails at the threshold because the evidence most favorable to the trial court's ruling is that the police report never existed. This follows because (1) Soratos explained that assigned police report numbers do not necessarily mean that a police report was generated at all, and (2) Detective Bryan affirmed that the police report number thought to refer to a police report about this case referred instead to a report about another case and no other police reports near the time of the crime at issue corresponded to this case. Thus, the prosecution did not fail to preserve or destroy evidence. We recognize that the trial court did not explicitly find that the police report never existed. It found that Soratos's testimony refuted the Evidence Code presumption that the police prepared a report "at least to some degree." But, even if one accepts that the police prepared a report for this case, the uncontradicted evidence supports only that the report was lost. No evidence supports that the loss could be considered in bad faith. (*People v. Ochoa* (1998) 19 Cal.4th 353, 417 [negligent failure to preserve evidence does not violate due process].)

(*Id.* at 5–8.)

A.    <u>Failure to Preserve</u>

Petitioner claims that the prosecutor and the police violated his right to due process by failing to preserve the report.

As the state Court of Appeal identified in its opinion, the government has a duty under due process to preserve material evidence, *i.e.*, evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means. *See California v. Trombetta*, 467 U.S. 479, 489 (1984); *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997). The exculpatory value of the evidence must be "apparent"; the mere possibility that evidence could have exculpated a defendant if preserved is insufficient to satisfy the standard of constitutional materiality in *Trombetta*. *Arizona v. Youngblood*, 488 U.S. 51, 56 n.* (1988). In addition, a petitioner must show bad faith on the part of the police in destroying the evidence. "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.* (citations removed).

**United States District Court**
For the Northern District of California

The state Court of Appeal reasonably determined that Petitioner's due process rights were not violated.  First, he has not shown that the report, even if it existed, had exculpatory value apparent before it was destroyed.  As there is no evidence about the contents of the report (if the report existed), it is unclear whether it had (or to what degree it had) apparent exculpatory value before it was destroyed.  Second, Petitioner has not made any showing that the police or the prosecutor acted in bad faith, *i.e.*, that they knew of the exculpatory value of the evidence and destroyed it all the same.  In fact, the state appellate court determined that "[n]o evidence supports that the loss [of the report] could be considered in bath faith."  (Ans., Ex. C at 7–8.)  Because the record contains ample evidence that no constitutional violation occurred, the state appellate court's decision was reasonable, and therefore is entitled to AEDPA deference.  The Court notes that not only is the hearing testimony regarding the report uncontroverted, this Court must defer to the trial court's determination that the hearing testimony was credible.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).

There is also no showing of prejudice, as there was strong evidence of Petitioner's guilt.  First, Petitioner admitted at his first trial that he had "tossed" Anthony against the crib with sufficient force to render him unconscious.  Second, Stephanie Rodriguez testified that Petitioner confessed both to her and their pastor, Alfred Florez, that Anthony had been injured by Petitioner's intentional acts, rather than that he had fallen accidentally.  Third, Florez told police investigators in an interview, a recording of which was played to the jury, that Petitioner had confessed that he had caused his son's death out of a fit of anger because the child would not stop crying.  (Ans., Ex. A, Vol. 2 at 719–20.)  Third, the physician who autopsied Anthony testified that there was evidence that the child's death was not accidental, that "there was some human agent involved."  (*Id.*, Ex. B, Vol. 3 at 659.)  In fact, the physical evidence was not consistent with Petitioner's explanation of an accidental fall.  (*Id.* at 660.)  Furthermore, Anthony's body showed signs of many unusual past injuries, indicating that in the years before his death, the child had sustained "substantial trauma."  (*Id.* at 654.)  This record of corroborated confessions and physical evidence clearly show that Petitioner suffered no prejudice.  Accordingly, this claim is DENIED.

**United States District Court**
For the Northern District of California

1    B.    Failure to Disclose

2         Petitioner claims that the prosecutor violated his constitutional rights under *Brady v.*

3    *Maryland*, 373 U.S. 83 (1963), by failing to disclose the police report.  Under *Brady*, the prosecution

4    must disclose material evidence "favorable to an accused," *id.* at 87, even if the accused has made no

5    request for the evidence in question.  *United States v. Agurs*, 427 U.S. 97, 110–11 (1976).  In order

6    to establish a *Brady* violation, a petitioner must show that:  (1) the evidence at issue was favorable to

7    the accused, either because it was exculpatory or impeaching; (2) the evidence had been suppressed

8    by the prosecution, either willfully or inadvertently; and (3) prejudice ensued.  *Banks v. Dretke*, 540

9    U.S. 668, 691 (2004).

10        This claim is without merit.  First, Petitioner has failed to show that the evidence was

11   favorable.  The record does not establish that a report existed; if it did, there is no evidence as to

12   what the report contained.  Second, even if an inference could be drawn that it was favorable,

13   Petitioner has not shown that the prosecution suppressed the report.  The undisputed record contains

14   no evidence that the report existed, that the prosecution had the report, or if it did, the prosecution

15   suppressed it as opposed to losing it inadvertently.  Third, Petitioner has not shown prejudice, as

16   shown above.  As the record shows no constitutional violation, the state court's decision was

17   reasonable.  This claim is DENIED.

18   C.    Instructing the Jury

19        Petitioner claims that the trial court violated his right to due process by refusing to instruct

20   the jury as follows:  "You may consider the fact that no report was maintained of the initial

21   investigation as evidence that the initial investigation in this matter determined the death of the child

22   as accidental."  (Pet. at 6; Ans., Ex. A, Vol. 3 at 474.)  The state appellate court mentioned, but did

23   not directly address this claim.  However, because it rejected Petitioner's central claim that the

24   report had exculpatory value, one can infer that it implicitly rejected the jury instruction claim.

25        As the state appellate court implicitly found, this claim is without merit.  While a defendant

26   is entitled to jury instructions that embody his defense theory, due process does not require that an

27   instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611

28   (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  Here, there was no evidence to

9

**United States District Court**
For the Northern District of California

1  support Petitioner's requested instruction, that is, there is no evidence as to what the report (if it

2  existed) contained.  The state court's decision was, therefore, reasonable.  Accordingly, this claim is

3  DENIED.

4  D.      Assistance of Trial Counsel

5          Petitioner claims that trial counsel rendered ineffective assistance by failing to (A) discover

6  the missing report; (B) impeach or cross-examine the records officer regarding how such reports are

7  kept; (C) call Petitioner's brother and sister-in-law to testify as character witnesses; and (D) move to

8  strike two jurors.  The state Supreme Court summarily denied these claims.

9          In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a habeas

10  Petitioner must establish two things.  First, he must establish that counsel's performance was

11  deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing

12  professional norms.  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  Second, he must

13  establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable

14  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

15  been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine

16  confidence in the outcome.  *Id.*  "The likelihood of a different result must be substantial, not just

17  conceivable."  *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011) (citing *Strickland*, 466 U.S. at 693).

18          1.      Discovering the Report

19          Petitioner claims that defense counsel rendered ineffective assistance by failing to discover

20  the report.  The record does not support Petitioner's claim.  Counsel <u>did</u> move for discovery of the

21  document, and asked for an evidentiary hearing when the report was not disclosed.  (Ans., Ex. A,

22  Vol. 3 at 432–35.)  On this record, Petitioner has not shown that counsel's performance was

23  deficient.  Also, Petitioner has not shown prejudice.  There is no record evidence that the report

24  would have been available had counsel asked for it earlier – an assumption flatly contradicted by the

25  undisputed record.  Furthermore, the report's contents, if it existed, are unknown, and therefore its

26  effect on the trial is unknowable.  Moreover, evidence of guilt was overwhelming as discussed

27  above.  Thus, there it cannot be shown there is a reasonable probability that but for counsel's

28

United States District Court

For the Northern District of California

1   (alleged) error, the outcome of the proceeding would have been different. Accordingly, this claim is

2   DENIED.

3       2.   Cross-Examination

4       Petitioner claims that counsel failed to impeach or sufficiently cross-examine the records

5   officer, Rachel Soratos. More specifically, Petitioner contends that counsel should have impeached

6   Soratos with the inconsistencies between her pretrial hearing and her trial testimony. This claim

7   lacks merit. First, the differences would not have impeached Soratos. She admitted that her

8   testimony changed because she had researched how records were kept around 1988. (Ans., Ex. B,

9   Vol. 3 at 732–33.) Second, because the jury knew that her testimony had changed based on newly-

10  discovered information, and therefore was not indicative of her credibility, counsel's alleged failure

11  to impeach cannot have resulted in prejudice. This claim is DENIED.

12      3.   Failure to Call Character Witnesses

13      This claim fails because Petitioner has not provided evidence that these witnesses would

14  have testified, nor has he provided evidence about what testimony these character witnesses would

15  have provided. Failure to provide such evidence – such as declarations from the witnesses

16  themselves – precludes this claim of ineffective assistance. *See Matylinksy v. Budge*, 577 F.3d 1083,

17  1096–97 (9th Cir. 2009); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000). This claim is DENIED.

18      4.   Failure to Strike Jurors

19      Petitioner claims that defense counsel rendered ineffective assistance by failing to move to

20  strike two jurors. According to Petitioner, the first juror had read newspaper articles about the case

21  and therefore was biased against him. The second juror, according to Petitioner, worked as a legal

22  secretary in the District Attorney's office which prosecuted this case and was therefore biased

23  against Petitioner. The state Supreme Court summarily denied this claim.

24      The record does not support Petitioner's claims. As to the first juror, he admitted only that

25  he barely read ("skimmed") and vaguely remembered a single story about the case. (Ans., Ex. I at

26  106.) He remembered only that it involved a two-year-old child. (*Id.*) He also indicated that he

27  could be fair. Because there is no evidence of bias, or that the vaguely-remembered article affected

28  the juror's ability to adhere to his juror's oath, Petitioner has not shown that counsel was ineffective.

United States District Court

For the Northern District of California

1    The record is bare of any indication that the trial court doubted this juror's assertion that he could be

2    fair and impartial.  This Court must accord such credibility determinations deference.  Again,

3    because the record does not support Petitioner's claim, the state court's decision was reasonable and

4    deserves AEDPA deference.

5            As to the second juror, the person in question did not serve on Petitioner's jury because

6    defense counsel moved to strike her.  (Ans., Ex. I at 130 and 146.)  Petitioner's claim is therefore

7    facially insufficient.  Because he moved to dismiss this juror, there was no deficient performance.

8    Because the stricken juror did not serve on the jury, there cannot have been prejudice.

9            In sum, Petitioner has not shown ineffective assistance, nor that the jury ultimately seated

10    was other than a panel of "impartial, indifferent jurors."  *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th

11    Cir. 1988).

12            Accordingly, Petitioner's ineffective assistance of counsel claims are DENIED.  Because the

13    claims are meritless, the state court's decision was reasonable.

14    E.       Assistance of Appellate Counsel

15            Petitioner claims that appellate counsel rendered ineffective assistance by failing to

16    (A) augment the record by adding the voir dire transcript, which would have supported his claim that

17    trial counsel should have struck two jurors; (B) make a discovery motion for the police report; and

18    (C) raise the claim that defense counsel failed to call character witnesses.

19            Claims of ineffective assistance of appellate counsel are reviewed according to the standard

20    set out in *Strickland*.  *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  A defendant therefore

21    must show that counsel's advice fell below an objective standard of reasonableness and that there is

22    a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on

23    appeal.  *See id.* at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

24            Habeas relief is not warranted here, even without AEDPA deference.  The claims raised in

25    the instant petition encompass the same ones for which Petitioner sought review in state court.

26    Because all the claims discussed above lack merit, irrespective of AEDPA, appellate counsel cannot

27    have rendered ineffective assistance by failing to raise them.  As those claims are lacking, Petitioner

28

cannot show a reasonable possibility that but for appellate counsel's actions, the outcome of the proceeding would have been different.  This claim is DENIED.

## V.   CONCLUSION

The state court's adjudication of Petitioner's claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, the petition is **DENIED**.

A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondent, and close the file.

IT IS SO ORDERED.

Dated:  February 4, 2013

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California

13